STATE of Missouri, Respondent,

v.

Misty LaDawn GRAVES, Appellant.

No. WD 57136.

Missouri Court of Appeals,
Western District.

April 18, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court May 30, 2000.

Application for Transfer Sustained
Aug. 29, 2000.

Case Retransferred Oct. 3, 2000.

Court of Appeals Opinion Readopted
Oct. 18, 2000.

Amy M. Bartholow, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for respondent.

Before JOSEPH M. ELLIS, P.J., PAUL M. SPINDEN and THOMAS H. NEWTON, JJ.

THOMAS H. NEWTON, Judge.

On April 27, 1998, Misty L. Graves was charged with one count of murder in the second degree, in violation of § 565.021,[1] and one count of unlawful use of a weapon, in violation of § 571.030.1(1). After a jury trial, Ms. Graves was found guilty of both charges. On April 12, 1999, Ms. Graves was sentenced to fifteen years and one year of imprisonment, and the sentences to run concurrently. Ms. Graves appeals the convictions and presents two points for our consideration. The judgment is affirmed.

## I. Background and Procedural History

On March 4, 1999, Ms. Graves' trial for murder in the second degree and unlawful use of a weapon began in the Circuit Court

1. All statutory references are to RSMo 1994, unless otherwise indicated.

of Cole County before the Honorable Patricia S. Joyce. The following evidence was presented at trial.

On the night of April 16, 1998 and the early morning of April 17, 1998, a pregnant eighteen-year-old Ms. Graves and her friend, Alvina Mahan, had several alcoholic drinks together at a bar in Jefferson City, Missouri. The two ladies left the bar together in Ms. Graves' Toyota Corolla and went to a gas station. At the gas station, they purchased a "fifth" of a mixed gin and juice drink and subsequently shared the drink. The ladies left the gas station and drove around in Ms. Graves' car, until they stopped on Lafayette St. and picked up Ms. Graves' boyfriend, Antwaine Jones. Mr. Jones got into the backseat of Ms. Graves' car, and they drove a short distance before coming in contact with Lashawn Covington, Mr. Jones' cousin. Mr. Covington asked Ms. Graves if she would give him a ride, and Ms. Graves agreed to do so. Mr. Covington got into the rear passenger seat.

After riding a short distance, it became apparent to Ms. Graves that Mr. Covington wanted her to take him to a location that was much further than she was willing to drive him. Ms. Graves and Mr. Covington got into a heated argument over the matter. During the exchange, Ms. Graves repeatedly told Mr. Covington to get out of her car, and Mr. Covington responded with profane threats and insults.

At one point during the argument, Ms. Graves said to Mr. Covington, "I'm ready to get out and lock all my doors." Mr. Covington stated, "If you get out of this car, I'm gonna whip your motherfucking ass!" Mr. Jones testified that he heard a pistol cock, and he noticed that Ms. Graves had her hands down to her side and out of his view. Mr. Jones positioned his body between Ms. Graves, who was in the driver's seat, and Mr. Covington, who was in the backseat behind the front passenger's seat, to prevent the confrontation from escalating. Mr. Jones testified that Ms.

Graves told him three times to "move," but that he responded, "Do you think I['m] gonna move and let you shoot at my cousin?" Moments later, though, as Mr. Jones began to step out of the car, he suddenly heard a gunshot. Mr. Jones looked into the backseat and saw an unresponsive Mr. Covington slumped over in the seat. Mr. Jones and Ms. Mahan were out of the car, and Ms. Graves drove off with Mr. Covington still laying in the backseat.

Ms. Graves dumped Mr. Covington's body in the front lawn of a Jefferson City house and then drove to her friend Charles Jackson's house. Ms. Graves told Mr. Jackson that her clothes were blood stained because she had been in a fight at a nightclub. Ms. Graves changed clothes and watched a movie with Mr. Jackson and another man. Shortly thereafter, Ms. Graves was arrested and taken into police custody.

After the close of the evidence on March 5, 1999, the jury returned guilty verdicts on both counts. Ms. Graves was sentenced to fifteen years and one year of imprisonment, and the sentences were to run concurrently. Ms. Graves appeals the convictions.

## II. Legal Analysis

### Prior Statement Concerning the Gun

■ In her first point, Ms. Graves complains that the trial court erred in overruling her objection to the admission of a portion of the testimony of Elaine Meadows, a witness for the State. Ms. Meadows testified that she saw the gun in Ms. Graves' possession a week prior to the shooting. Ms. Meadows further testified that, at that time, she asked Ms. Graves if she had already fired her new gun, and Ms. Graves responded that "she wanted to shoot someone with it." Ms. Graves argues that this testimony was inadmissible in that it was not probative of guilt on either of the charges against her, but was evidence of her bad character whose preju-

dicial effect far outweighed any probative value it may have had.

■ The trial court has broad discretion in deciding whether to admit evidence, and we will not disturb its decision to do so unless a clear abuse of discretion is shown. *State v. Scurlock,* 998 S.W.2d 578, 587 (Mo.App. W.D.1999). Evidence of bad acts is generally inadmissible to show the bad character or the propensity of a defendant to commit the charged crime. *State v. Beal,* 966 S.W.2d 9, 13 (Mo.App. W.D. 1997). However, such evidence is admissible to prove the crime charged when it tends to establish motive, *intent,* the absence of mistake or accident, a common scheme or plan, or the identity of the person charged. *Id.* We find the testimony in question to be admissible as being probative on the issue of Ms. Graves' intent. It certainly stands to reason that if just one week prior to the shooting, Ms. Graves said that she wanted to shoot someone, the jury could infer that Ms. Graves may have intended to use her weapon. Thus, we find this point to be without merit.

### Post-arrest, Pre-*Miranda* [2] Silence

In her second point, Ms. Graves claims that the trial court committed plain error in allowing the prosecution to mention in its opening statement and to elicit testimony that she failed to make an exculpatory statement immediately after her arrest. Ms. Graves focuses on three separate occasions during the trial in which either the prosecuting attorney or a prosecution witness referred to Ms. Graves' post-arrest silence. First, in its opening statement, the prosecutor described the circumstances at the time of Ms. Graves' arrest, in part, as follows:

> Police have circled around. They see her lying flat down on a porch. They call her down. They call her down and she is arrested. You will not hear that police officer tell you that she's claiming

self-defense. You'll *not* hear him say that she said, "Oh my God, I can't believe I had to do that." They simply arrest her.

Then, on direct examination, in the State's case-in-chief, the prosecutor and the arresting police officer, Steve Newman, had the following exchange concerning Ms. Graves' arrest:

> [prosecutor]: What happened next?
>
> [Newman]: She stood up, walked down the stairs to me. And at this time, I placed her in handcuffs and called for a car to come and pick her up in the alleyway.
>
> [prosecutor]: Did she say anything to you?
>
> [Newman]: No, she did not say anything.

Finally, in closing argument, the prosecutor said to the jury:

> Nothing about self-defense came up. When she's arrested, Newman tells you she doesn't say a word. She doesn't say a word. She gets up, she's lying, hiding, lying down on the roof, and he calls her out, and she comes down and doesn't say – does not cry, "God, I didn't do it. You've got to believe me." Nothing. So that matches what Newman tells you, matches what Charles Jackson told you, and that is, she never said a word about self-defense. None of this stuff comes up.

Ms. Graves failed to object to the State's opening statement reference, its closing argument reference, and the witness testimony on her post-arrest silence. She first alleged error due to the admission of the prosecutor's comments and witness' testimony in her motion for new trial. She requests plain error review under Rule 30.20, claiming that these three separate references to her post-arrest silence resulted in manifest injustice or a miscarriage of justice, mandating reversal of her convictions.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.  1602, 16 L.Ed.2d 694 (1966).

Under Rule 30.20, plain error review involves a two-step process. *Scurlock*, 998 S.W.2d at 586. First, we determine whether plain error has occurred. In other words, we determine whether the claim for review "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.'" *Id.*; *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). If we find plain error on the face of the claim, we may, at our discretion, undertake the second step: determining whether the claimed error actually resulted in manifest injustice or miscarriage of justice. *Scurlock*, 998 S.W.2d at 586. Manifest injustice depends on the facts and circumstances of the particular case. *State v. Zindel*, 918 S.W.2d 239, 241 (Mo. banc 1996). "When guilt is established by overwhelming evidence no injustice or miscarriage of justice will result from the refusal to invoke the rule." *State v. Jordan*, 627 S.W.2d 290, 293 (Mo. banc 1982).

Consistent with the Fifth Amendment privilege against self-incrimination is the notion that the State may not use post-arrest silence as affirmative proof of the defendant's guilt. *State v. Rogers*, 973 S.W.2d 495, 497 (Mo.App. S.D.1998). Ms. Graves reminds us that the United States Supreme Court has held, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Rogers* and *Doyle* are distinguishable from the case at bar in one critically important respect, though. *Rogers* and *Doyle* involve situations where, for the purpose of impeachment, the prosecution used a defendant's silence after receiving *Miranda* warnings. In the present case, neither Ms. Graves nor the State alleges that *Miranda* warnings had been given prior to the time in question. Since the record does not reveal when, if ever, *Miranda* warnings were issued either, we assume that they were not issued before the time of Ms. Graves' impugned silence.

In the absence of the implicit assurance of *Miranda*, an accused is under no inducement to remain silent. *State v. Antwine*, 743 S.W.2d 51, 69 (Mo. banc 1987). "*Doyle* does not create a per se rule rendering inadmissible any reference to the post-arrest silence of a criminal defendant. Rather, *Doyle* is expressly limited to the use of silence 'at the time of arrest and after receiving *Miranda* warnings.'" *State v. Mahan*, 971 S.W.2d 307, 315 (Mo. banc 1998). In fact, under Missouri case law, a defendant's immediate post-arrest, pre-*Miranda* silence can be used against him for purposes of impeachment. Post-arrest, pre-*Miranda* silence is customarily used to impeach a criminal defendant "when a neutral expectancy of an exculpatory statement exists as a result of a defendant's testimony and defendant's silence is probative of inconsistencies in that testimony." *State v. Antwine*, 743 S.W.2d at 69. "Where a defendant later offers an explanation for his conduct under circumstances suggesting he would naturally have given the explanation earlier, if true, his previous silence may be used for impeachment purposes if his silence was not the result of an exercise of a constitutional right." *State v. Smith*, 824 S.W.2d 127, 130 (Mo.App.S.D.1992). Further, as was the case in *State v. Boyd*, 954 S.W.2d 602 (Mo.App. W.D.1997), post-arrest, pre-*Miranda* silence may be used by the State for impeachment purposes even when the defendant does not testify at trial.

In *Boyd*, the defendant, Mr. Boyd, had ridden as a passenger in a car driven by Mr. James Evans. A police officer had noticed them driving erratically, and after running the car's license plate, determined that the plate actually belonged to a different vehicle. A high-speed chase ensued and it continued until Mr. Boyd and Mr. Evans eventually crashed into a tree. Upon arresting Mr. Boyd, the police discovered a small compact container of what

was later determined to be methamphetamine.

Mr. Boyd was tried for possession of a controlled substance (methamphetamine) with intent to distribute, deliver or sell and for unlawful use of a weapon—a charge that was dismissed at trial. While Mr. Boyd did not testify at trial, his defense to the drug charge essentially was that at the time of his arrest, he was an innocent bystander to the chase and a captive of who he claimed to be the real wrongdoer, Mr. Evans. The jury ultimately found Mr. Boyd guilty, though. On appeal, Mr. Boyd contended, among other things, that the trial court committed plain error by failing to declare, *sua sponte*, a mistrial after the prosecutor, in his closing argument, told the jury that guilt could be inferred from the fact that Mr. Boyd did not offer an exculpatory explanation to the arresting officer upon his arrest. Mr. Boyd appealed, and in affirming Mr. Boyd's conviction, this court said:

> Here, the appellant did not testify, so impeachment of his testimony was not a purpose of the prosecutor's comments. However, the purpose of the comments was clearly to impeach or contradict appellant's defense that he was an innocent bystander and did not commit any crimes. We fail to see how under plain error review the prohibition exception stated in *Antwine* would not apply to the rebutting of a defense.

*Boyd*, 954 S.W.2d at 610.

The case at bar is similar, in many respects, to the *Boyd* case. Both cases present criminal defendants who, after their arrests and before they were issued *Miranda* warnings, failed to utter any words of the sort that one would expect to hear from a person who has been arrested for conduct that they believe was either wholly innocent or legally justified. Both cases involve prosecutors who then attempted to use the defendants' post-arrest, pre-*Miranda* silence to impeach the defendants' purported defenses. There is, however, a striking dissimilarity between the two cases.

In *Boyd*, the prosecutor mentioned the fact that Mr. Boyd failed to offer a post-arrest, pre-*Miranda*, exculpatory statement in his closing argument, thus impeaching Mr. Boyd's defense. In contrast, the prosecutor in the present case not only referred to Ms. Graves' post-arrest silence in his closing argument; he referred to it in his opening statement as well. Moreover, in the present case, Steve Newman, a prosecution witness, was allowed to testify to Ms. Graves' silence on direct examination in the State's case-in-chief. The State, therefore, twice seized opportunities to use Ms. Graves' silence in circumstances where there had been no evidence of a defense introduced by Ms. Graves that could be impeached by her silence or anything else, for that matter. By referring to Ms. Graves' silence in its case-in-chief, the State necessarily used Ms. Graves' post-arrest silence, not as impeachment, but rather as affirmative proof of her guilt. *Antwine*, this state's seminal case permitting use of a defendant's post-arrest, pre-*Miranda* silence for purposes of impeachment, and its progeny do not extend use of this silence as substantive proof of guilt, and neither do we. While neither *Boyd* nor any other Missouri case expressly provides that the State's use of post-arrest, pre-*Miranda* silence as affirmative proof of guilt is prohibited, we consider such a use of all post-arrest silence, both before and after *Miranda* warnings are issued, repugnant to the Fifth Amendment privilege against self-incrimination.

The Fifth Amendment commands that, in a criminal case, no person shall be compelled to be a witness against himself. *Mahan*, 971 S.W.2d at 314. The mandatory warnings outlined in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are designed to protect a criminal defendant's privilege against self-incrimination. *Id.* This principle is just as applicable to non-statements, silence, as it is those that are compelled by

government actors. See, *State v. Rogers*, 973 S.W.2d 495, 497 (Mo.App. S.D.1998); *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). While the law in Missouri does permit the use of pre-*Miranda* silence to impeach a defendant's testimony and to contradict a defendant's defense, the adverse effect on the Fifth Amendment is too severe to extend the use of post-arrest, pre-*Miranda* silence for affirmative proof of guilt.

■ In the case at bar, the State's references to Ms. Graves' silence did not merely contradict her defense. Ms. Graves did reveal in her opening statement that she was using a self-defense strategy. However, the opening statement is not a presentation of evidence and, thus, did not present anything for the State to impeach or contradict. Further, while, as it turned out, Ms. Graves did raise self-defense in her case-in-chief, we cannot thereby conclude, in retrospect, that no harm was done in the end. At the moment the State referred to Ms. Graves' silence in its case-in-chief, Ms. Graves' Fifth Amendment privilege against self-incrimination was violated. We find that such a constitutional violation facially establishes substantial grounds for believing that a miscarriage of justice has occurred and compels us to invoke plain error review. However, upon review of all the evidence, we are not persuaded that a miscarriage of justice or manifest injustice actually occurred in this case.

Under plain error review, we reverse a conviction only if the challenged comments had a decisive effect on the jury's verdict. *State v. Roberts*, 838 S.W.2d 126, 131–32 (Mo.App. E.D.1992). The record clearly shows that Ms. Graves was the person who shot and killed LaShawn Covington, and even absent the evidence of Ms. Graves' post-arrest silence, there is overwhelming evidence in the record that Ms. Graves is criminally liable for the homicide. There is no reasonable probability that absent these comments, the verdict would have been different. See, *State v. Roberts*, 838

S.W.2d 126, 132 (Mo.App. E.D.1992). Finally, if this point had been preserved by objections at trial, the decision of the court may have been different.

### CONCLUSION

We find that the trial court erred in allowing the State to mention Ms. Graves' post-arrest, pre-*Miranda* silence in its opening statement and in allowing the State to present this type of testimony in its case-in-chief. However, under the facts of this case, no plain error was committed. We affirm.

SPINDEN and ELLIS, JJ., concur.